1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    HILLIARD WILLIAMS,                        No.  2:14-cv-1248 KJM AC P

12                      Plaintiff,

13          v.                                  ORDER and

14    JAROM A. DASZKO, et al.,                  FINDINGS AND RECOMMENDATIONS

15                      Defendants.

16

17        **I.       Introduction**

18              Plaintiff Hilliard Williams is a state prisoner currently incarcerated at the Correctional

19    Health Care Facility (CHCF) in Stockton, under the authority of the California Department of

20    Corrections and Rehabilitation (CDCR).  Plaintiff proceeds in forma pauperis and with appointed

21    counsel in this civil rights action filed pursuant to 42 U.S.C. § 1983.  This case proceeds on

22    plaintiff's original complaint on claims that defendant CDCR physicians Jarom Daszko and

23    David Mathis were deliberately indifferent to plaintiff's serious medical needs in violation of the

24    Eighth Amendment during plaintiff's previous incarceration at the California Medical Facility

25    (CMF).  See ECF No. 1.

26              Presently pending for decision are defendants' separate motions for summary judgment.

27    See ECF Nos. 90, 92.  The motions were heard by the undersigned on January 24, 2018.  Plaintiff

28    was represented by Alexander Smith and Michelle Peleg; defendant Daszko was represented by

Kevin Dehoff; and defendant Mathis was represented by Joseph Wheeler. This action is referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302(c). For the reasons that follow, this court recommends that summary judgment be granted for defendant Daszko, and denied for defendant Mathis.

## II.    **Background**

Plaintiff filed his original complaint in May 2014, and completed his request to proceed in forma pauperis in June 2014. In September 2014, the court granted plaintiff's request to proceed in forma pauperis, and found that his complaint states cognizable Eighth Amendment claims against defendants Mathis and Daszko, for whom service of process was appropriate. The defendants filed separate answers to the complaint in December 2014, and the court issued an initial Discovery and Scheduling Order on December 31, 2014.

In March 2015, defendants filed separate motions for summary judgment premised on plaintiff's alleged failure to exhaust his administrative remedies before commencing this action. In February 2016, the undersigned recommended that both motions be denied; these findings and recommendations were adopted by the district judge in March 2016. Thereafter, defendants declined the court's invitation to participate in a settlement conference, and the court issued an Amended Discovery and Scheduling Order in April 2016, and a Further Amended Discovery and Scheduling Order later that month.

In November 2016, the court granted plaintiff's request for appointment of counsel and issued another Further Amended Discovery and Scheduling Order, which was further modified in May 2017 and September 2017 at the parties' requests.

Defendants filed their respective pending motions for summary judgment in November 2017. Plaintiff filed one comprehensive opposition to both motions, ECF No. 98; defendants filed separate replies, ECF Nos. 100, 101; plaintiff responded to defendant Mathis' evidentiary objections with a request that his response be construed as an authorized surreply, ECF No. 102. For the reasons offered by plaintiff, see ECF No. 102 at 1 n.1, plaintiff's request is granted.

Pursuant to the parties' preexisting stipulation to protect the confidentiality of plaintiff's medical records, all parties requested that such evidence be filed in this court under seal.

Although this was a departure from the usual practice of this court, the undersigned granted the requests, subject to the following qualification:

> Although the parties are free to enter into such agreements without a court order, plaintiff's medical records are essential to address the merits of this action – in the parties' briefing, at oral argument, and in the court's orders and findings and recommendations. While the court will permit the parties to file plaintiff's medical records under seal, thus protecting the original documents from public view, the court will place no restrictions on subsequent references to, or reliance on, plaintiff's medical records in the parties' briefing, at oral argument, or in the court's written references and analyses.

ECF Nos. 86 at 1-2, 88 at 1-2, 95 at 2.

### III.    Legal Standards

#### A.    Legal Standards for Motions for Summary Judgment

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under summary judgment practice, the moving party "initially bears the burden of proving the absence of a genuine issue of material fact." Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Securities Litigation), 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admission, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56 (c)(1)(A), (B).

When the non-moving party bears the burden of proof at trial, "the moving party need only prove that there is an absence of evidence to support the nonmoving party's case." Oracle Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325); see also Fed. R. Civ. P. 56(c)(1)(B). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See

3

Celotex, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment ... is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(c)(1); Matsushita, 475 U.S. at 586 n.11. Moreover, "[a] [p]laintiff's verified complaint may be considered as an affidavit in opposition to summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence." Lopez v. Smith, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000) (en banc).[1]

The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Assoc., 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not

---

[1] In addition, in considering a dispositive motion or opposition thereto in the case of a pro se plaintiff, the court does not require formal authentication of the exhibits attached to plaintiff's verified complaint or opposition. See Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003) (evidence which could be made admissible at trial may be considered on summary judgment); see also Aholelei v. Hawaii Dept. of Public Safety, 220 Fed. Appx. 670, 672 (9th Cir. 2007) (district court abused its discretion in not considering plaintiff's evidence at summary judgment, "which consisted primarily of litigation and administrative documents involving another prison and letters from other prisoners" which evidence could be made admissible at trial through the other inmates' testimony at trial); see Ninth Circuit Rule 36-3 (unpublished Ninth Circuit decisions may be cited not for precedent but to indicate how the Court of Appeals may apply existing precedent).

4

establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (citations omitted).

In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all reasonable inferences supported by the evidence in favor of the non-moving party." Walls v. Central Costa County Transit Authority, 653 F.3d 963, 966 (9th Cir. 2011) (per curiam). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. … Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

In applying these rules, district courts must "construe liberally motion papers and pleadings filed by pro se inmates and … avoid applying summary judgment rules strictly." Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010). However, "[if] a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]" Fed. R. Civ. P. 56(e)(2).

**B.** **Legal Standards for Deliberate Indifference to Serious Medical Needs**

"[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain, proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Estelle v. Gamble, 429 U.S. 97, 104-05 (1976) (internal citations, punctuation and quotation marks omitted). "Prison officials are deliberately

5

indifferent to a prisoner's serious medical needs when they 'deny, delay or intentionally interfere with medical treatment.'" Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990) (quoting Hutchinson v. United States, 838 F.2d 390, 394 (9th Cir. 1988)).

"In the Ninth Circuit, the test for deliberate indifference consists of two parts. First, the plaintiff must show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. Second, the plaintiff must show the defendant's response to the need was deliberately indifferent. This second prong ... is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal citations, punctuation and quotation marks omitted); accord, Wilhelm v. Rotman, 680 F.3d 1113, 1122 (9th Cir. 2012); Lemire v. CDCR, 726 F.3d 1062, 1081 (9th Cir. 2013).

To prevail on a claim for deliberate indifference to serious medical needs, a prisoner must demonstrate that a prison official "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). Because "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment," the evidence must show the defendant acted with a "sufficiently culpable state of mind." Wilson v. Seiter, 501 U.S. 294, 297 (1991) (internal quotation marks, emphasis and citations omitted).

Whether a defendant had requisite knowledge of a substantial risk of harm is a question of fact. "[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. . . . The inference of knowledge from an obvious risk has been described by the Supreme Court as a rebuttable presumption, and thus prison officials bear the burden of proving ignorance of an obvious risk. . . . [D]efendants cannot escape liability by virtue of their having turned a blind eye to facts or inferences strongly suspected to be true." Coleman v. Wilson, 912 F. Supp. 1282, 1316 (E.D. Cal. 1995) (citing Farmer, 511 U.S. at 842-43) (internal quotation marks omitted).

When the risk is not obvious, the requisite knowledge may still be inferred by evidence showing that the defendant refused to verify underlying facts or declined to confirm inferences that he strongly suspected to be true. Farmer, 511 U.S. at 842. Prisons officials may avoid liability by demonstrating "that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." Id. at 844. Thus, liability may be avoided by presenting evidence that the defendant lacked knowledge of the risk and/or that his response was reasonable in light of all the circumstances. Id. at 844-45; see also Wilson, 501 U.S. at 298; Thomas v. Ponder, 611 F.3d 1144, 1150-51 (9th Cir. 2010).

## IV. Evidentiary Objections

Included in his reply brief are defendant Mathis' objections to the report of plaintiff's expert, Dr. Gregory Gilbert. See ECF No. 101-3 (objections). Dr. Gilbert is a Clinical Associate Professor at Stanford Medical School, Department of Surgery, Division of Emergency Medicine Division, with a specialty in treating burn injuries. See ECF No. 98-1, Ex. 2 (curriculum vitae); ECF No. 98-2 (Gilbert Declaration); ECF No. 97, Ex. 2 (Gilbert expert report) (sealed). Plaintiff filed a substantive response to defendant Mathis' objections, see ECF No. 102, which the court construes as an authorized surreply, see id. at 2 n.1. For the reasons that follow, defendant Mathis' objections are overruled.

Defendant Mathis initially makes two general objections to Dr. Gilbert's expert report: first, that Dr. Gilbert's report is irrelevant to the question of deliberate indifference because it concludes only that defendants' treatment of plaintiff "fell below the minimum standard of medical care" and is thus limited to the question of medical negligence or malpractice, ECF No. 101-3 at 2; and second, because Dr. Gilbert did not examine plaintiff, some of his opinions are inadmissible under Federal Rule of Evidence 702[2] because "speculative, not based on sufficient

---

[2] Federal Rule of Evidence 702 provides in full:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the

facts or data, and not the product of reliable principles and methods," id. at 2-4.

Plaintiff responds that "relevance" objections are improper on summary judgment, and the failure of Dr. Gilbert to examine plaintiff does not render his opinions inadmissible. Plaintiff emphasizes that Dr. Gilbert qualifies as an expert under Rule 702 because he is clinically qualified to opine on the treatment of burn injuries and pain management, and "painstakingly reviewed plaintiff's medical records (both from the CDCR and from the outside hospitals that treated his burn wounds), as well as the relevant medical literature and all of the deposition testimony from this case." ECF No. 102 at 3-4 (citing cases).

Defendant Mathis does not dispute that Dr. Gilbert is a qualified expert, which renders irrelevant his general objection based on relevance. Dr. Gilbert's avoidance of the term "deliberate indifference" is appropriate as it would otherwise reflect an improper legal conclusion. "[E]xpert testimony using the legally significant terms 'deliberate indifference' and 'objective reasonableness' should be excluded. [¶] But the cases also consistently hold that while an expert cannot testify as to 'deliberate indifference' or 'objective reasonableness' using those specific terms, . . . they may opine as to the appropriate standards of healthcare in a correctional facility[.]" M.H. v. County of Alameda, 2015 WL 54400, at *2, 2015 U.S. Dist. LEXIS 44, at *7 (N.D. Cal. 2015) (citations omitted) (collecting cases). "Thus, experts on both sides may testify as to appropriate standards of care – which go to the ultimate issues of 'deliberate indifference' and what conduct is 'objectively reasonable' – so long as they do not use those 'judicially defined' and 'legally specialized' terms." Id., 2015 WL 54400, at *2, 2015 U.S. Dist. LEXIS 44, at *7-8.

Moreover, "[i]t is axiomatic that a court only considers relevant evidence on a motion for summary judgment." Powell v. Union Pacific Railroad Co., 864 F. Supp. 2d 949, 953 n.2 (E.D. Cal. 2012) (citing Burch v. Regents of the University of California, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006)). "A court can award summary judgment only when there is no genuine dispute

---

evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

of *material* fact.  It cannot rely on irrelevant facts, and thus relevance objections are redundant.

[¶] Instead of *objecting*, parties should simply *argue* that the facts are not material."  Burch, 433

F. Supp. 2d at 1119 (original emphasis); accord, California Sportfishing Protection Alliance v.

River City Waste Recyclers, LLC, 205 F. Supp. 3d 1128, 1133 (E.D. Cal. 2016).  For these

reasons, defendant Mathis' general objection to Dr. Gilbert's report and opinions on relevance

grounds is overruled.

The court also overrules defendant Mathis' general objection to Dr. Gilbert's expert report

on the ground that he did not physically examine plaintiff.  Dr. Gilbert's specialized expertise and

thorough review of plaintiff's medical records render his opinions both admissible and probative

because based on "scientifically valid principles" and "rest[ing] on a reliable foundation . . .

relevant to the task at hand."  Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597

(1993); see also Hopkins v. Dow Corning Corporation, 33 F.3d 1116, 1125 (9th Cir. 1994)

(expert medical opinion based on review of medical records, clinical experience and relevant

medical literature constitutes scientifically valid reasoning or methodology) (citing Daubert, 509

U.S. at 592-93).  Challenges to medical expert opinions that do not include the expert's physical

examination of the patient remain "based on sufficient facts and data . . . [that] go to weight, not

admissibility."  In re Toyota Motor Corp., 978 F. Supp. 2d 1053, 1073 (C.D. Cal. 2013).

Defendant Mathis next objects to several of Dr. Gilbert's specific opinions.  See ECF No.

101-3 at 2-4.  Plaintiff challenges each of these objections.  See ECF No. 102.  The court has

considered these matters throughout its analysis.  To the extent that Dr. Gilbert's medical opinion

is premised on undisputed facts or immaterial subsidiary factual disputes, it is probative in

determining whether either defendant was deliberately indifferent in treating plaintiff's serious

medical needs.  Cf. Brook v. Carey, 2007 WL 2069941, at *14, 2007 U.S. Dist. LEXIS 50915, at

*48 (E.D. Cal. July 13, 2007), adopted Aug. 30, 2007 ("although there may be subsidiary issues

of fact in dispute, unless plaintiff can provide expert evidence that the treatment he received

equated with deliberate indifference thereby creating a material issue of fact, summary judgment

should be entered for defendants").  However, the court does not rely on any medical opinion of

Dr. Gilbert that rests on disputed material facts.  See Nuveen Quality Income Mun. Fund Inc. v.

Prudential Equity Grp., LLC, 262 Fed. Appx. 822, 824-25 (9th Cir. 2008) ("An expert opinion is properly excluded where it relies on an assumption that is unsupported by evidence in the record and is not sufficiently founded on facts.") (citing Guidroz-Brault v. Mo. Pac. R.R. Co., 254 F.3d 825, 829-31 (9th Cir. 2001)). Subject to these considerations, defendant Mathis' objections to the specific opinions of Dr. Gilbert are overruled.

## V.  **Facts**

For purposes of summary judgment, the following facts are undisputed by the parties or as determined by the court, unless identified as disputed for the reasons noted.[3]

- At all times relevant to this action, plaintiff Hilliard Williams was an inmate at the California Medical Facility (CMF), and defendants Jarom Daszko, M.D., and D. Mathis, M.D., were CDCR physicians on staff at CMF.

- In September 2012, plaintiff was 48 years old with several medical problems including a seizure disorder, asthma, anemia, lupus, rheumatoid arthritis, and chronic pain. Plaintiff used a wheelchair on a regular basis and was regularly prescribed several medications. To treat his chronic pain, plaintiff was regularly prescribed, three times per day, 15 mg immediate release (IR) morphine, 30 mg extended release (ER) morphine, and 650 mg acetaminophen. According to plaintiff's primary care physician (PCP) at CMF, Dr. John Wieland, plaintiff "followed through with treatments appropriately," "was always respectful," and exhibited no signs of "drug-seeking behavior." Smith Decl., Ex. 4 (Wieland Depo. at 53:20-2, 64:17-21).

- On September 7, 2012, a Friday, at approximately 1:15 a.m., another prisoner poured a mixture of boiling water, oil, Noxzema and Magic Shave on plaintiff while he was sleeping. Plaintiff was taken to the prison emergency room, known as the Treatment and Triage Area (TTA),

---

[3] These facts are taken from plaintiff's verified complaint, ECF No. 1, and attached exhibits; Defendant Daszko's Statement of Undisputed Material Facts (SUF), ECF No. 90-2, and supporting declarations and exhibits; Defendant Mathis' Statement of Undisputed Material Facts (SUF), ECF No. 92-2, and supporting declarations and exhibits; Plaintiff's Responses to Defendants' Statements of Undisputed Facts, ECF Nos. 98-3 and 98-4; Plaintiff's Statement of Additional Material Facts (SAF), ECF No. 98-5, and Defendants' Respective Responses thereto, ECF Nos. 100-1 and 101-1; Defendant Mathis' Reply to Plaintiff's Response, ECF No. 101-2; and Plaintiff's Response thereto (authorized surreply), ECF No. 102.

10

at approximately 1:30 a.m.

- Defendant Dr. Daszko was the TTA physician on duty who initially treated plaintiff. Dr. Daszko noted that plaintiff was "in quite a bit of pain," "moaning," "shouting," "grimacing," and "writhing." Smith Decl., Ex. 3 (Daszko Depo. at 78:17-20, 80:23-81:1). To treat plaintiff's acute pain, Dr. Daszko gave plaintiff two doses of IR morphine intravenously: 5 milligrams (mg) at 2:22 a.m., and 5 mg at 3:57 a.m. Dr. Daszko started a saline IV and oversaw application of a salve to plaintiff's burns. At approximately 4:30 a.m., Dr. Daszko transferred plaintiff to San Joaquin General Hospital (SJGH) because he believed plaintiff needed direct, continuous care, and assessment whether his airway was compromised.

- At SJGH, plaintiff received additional morphine (2.5 mg morphine via IV at 7:25 a.m.) to relieve his pain, which he described as a "10" on an ascending scale of 0 to 10. Plaintiff was diagnosed with second-degree burns.

- Before his shift ended, Dr. Daszko confirmed with SJGH that plaintiff was stable and had no threat of airway compromise. Dr. Daszko spoke with a physician at the University of California, Davis, Medical Burn Center (Burn Center), who recommended that plaintiff be transferred there for observation within 72 hours. During the shift change, Dr. Daszko informed CMF physician, Dr. Mehta, of plaintiff's condition and treatment, and that plaintiff was scheduled for treatment later that day at the Burn Center.

- Plaintiff returned to CMF's TTA from SJGH at about 2:00 p.m., where he was treated by Dr. Mehta. Plaintiff described his pain as an "8" out of 10; Dr. Mehta prescribed one 30 mg ER morphine tablet, which plaintiff received at 3:02 p.m.

- Later that afternoon, plaintiff was transported to the Burn Center, where he was treated by Burn Fellow Dr. Mario Velez Palafox; there is no record evidence indicating that plaintiff received additional pain medication while at the Burn Center.

- Plaintiff was returned to CMF's TTA from the Burn Center at about 8:45 p.m., at which time he was treated by defendant Dr. Mathis, who did not administer or prescribe additional pain medications. Dr. Mathis reviewed Dr. Palafox's notes and followed his orders. Dr. Mathis debrided the burns on plaintiff's face and dressed the wounds with bacitracin/zinc

ointment.  Dr. Mathis instructed plaintiff to (a) leave the arm bandages in place until the following Thursday when he should return to the clinic for their removal and then be evaluated whether he required a return to the Burn Center; and (b) continue applying ointment to his face and return to the clinic if he needed more.  See Mathis Decl., Ex. G (Sept. 7, 2012 treatment note) (ECF No. 89 at 35).

- It is undisputed that plaintiff's regularly prescribed pain medications were recommenced the evening of September 7, 2012, after plaintiff's appointment with Dr. Mathis, specifically, one 15 mg IR morphine tablet, one 30 mg ER morphine tablet, and 650 mg acetaminophen.  Administered three times per day, these medications were continued the next morning, September 8, 2012, until September 10, 2012, when plaintiff was returned to the Burn Center.  See Mathis Decl., Ex. H (Pltf. Medication Administration Records, ECF No. 89 at 36-9); see also Pltf. Rsps. to Mathis' SUF #13 & SUF #14 (ECF No. 98-4 at 5).

- Three days later, on September 10, 2012, plaintiff was re-admitted to the Burn Center on referral from an unidentified CMF physician who determined that plaintiff had a fever and was at risk of cellulitis.  Plaintiff remained at the Burn Center until September 13, 2012, when he was discharged.  Smith Decl., Ex. 18 (ECF No. 96 at 177-221); Gilbert Report at 204-5 (ECF No. 97 at 10-1).  While plaintiff was being treated at the Burn Center, he received narcotic drugs, including intravenous morphine and fentanyl, to treat his pain.  Id.  Once discharged from the Burn Center and back at CMF, plaintiff received his regularly prescribed pain medications.

- On September 17, 2012, plaintiff was examined by Dr. Mehta, who was caring for Dr. Wieland's primary care patients in his absence.  Dr. Mehta found plaintiff's burn lesions "drying, healing, and with scabbing," without vesicles, pustules or discharge.  Dehoff Decl., Ex. F (Sept. 17, 2012 treatment note by Dr. Mehta, ECF No. 91 at 12); see also id., Ex. G (Mehta Depo. at 196:22-198:6) (plaintiff's burns were "healing" and his vital signs were "normal").  Dr. Mehta noted that plaintiff requested "more morphine" but directed plaintiff to continue his regularly prescribed medications and to schedule another examination the following week.  Dehoff Decl., Ex. F (ECF No. 91 at 12).  Dr. Mehta testified that, as of September 17, 2012, plaintiff's pain was no longer acute but chronic.  Mehta Depo. at 197:17-25.

• On September 20, 2012, plaintiff submitted an inmate health care appeal, Log No. CMF HC 12037206.  See Complaint, Ex. A, ECF No. 1 at 22-32.  Plaintiff described his injuries and requested additional pain medications, stating:

> Although I have repeatedly asked for pain meds to address the severe pain that I am suffering, I have repeatedly been told that I need to see my own PCP [Dr. Wieland] for any pain medication. Presently, my assigned PCP is on vacation and I am told that I must wait additional two (2) weeks before my health issues can be addressed.  This is unacceptable that any human being can be allowed to suffer that pain that I am suffering while the so called CMF medical department turns a deaf ear and a blind eye to my pain and suffering.  Since being severely burned, I have been denied proper medical care resulting in my burns becoming infected resulting in my having to be admitted to an outside hospital for treatment, something that should not have taken place.  This after being refused any treatment at all by one of the CDCR's contracting outside hospitals [SJGH] because I had an appointment scheduled at another hospital [UCD Burn Center] at a later time.  This is completely unacceptable!

Id. at 24, 26 (with minor edits).

In this appeal, plaintiff requested the following relief:

> (1)  Provide me with the necessary and proper care and pain medication so that I am no longer needlessly suffering the severe pain from the burns that I received on or about 9/7/2012.  (2) Take no type of retaliation against me for the filing of this CDCR 602-HC Appeal, either directly or by proxy.  (3) Provide me with immediate and adequate pain management for my severe injuries.

Id. (with minor edits).

• Also on September 20, 2012, plaintiff submitted a "Health Care Services Request Form," in which he stated: "Something is wrong with my arm and my eyes are still blurry.  Please help.  I am in lots of pain that's not going away.  And I still have not seen the psych doctor '3rd request'."  Smith Decl., Ex. 10 (ECF No. 96 at 152).

• On September 21, 2012, plaintiff saw defendant Dr. Daszko in the B-1 medical clinic when plaintiff was having his bandages changed; this was not a scheduled appointment with Dr. Daszko.  Plaintiff testified that he asked Dr. Daszko for additional pain medication but Dr. Daszko prescribed only ice packs.  Pltf. Depo. at 99:25 – 100:25.

• On September 23, 2012, plaintiff was seen by a triage nurse and described his pain as

13

an "8" out of 10.  Smith Decl., Ex. 10 (ECF No. 96 at 152).

• On September 24, 2012, after his return from vacation, Dr. Wieland met with plaintiff and prescribed him additional pain medication to treat his acute pain, in addition to his regularly prescribed medications to treat his chronic pain.  Smith Decl., Ex. 12 (Wieland's Sept. 24, 2012 TTA treatment note, ECF No. 96 at 158).[4]

• Plaintiff remained on an elevated dose of morphine until October 1, 2012.  Smith Decl., Ex. 15 (Wieland's Sept. 24, 2012 ACC/PCP treatment note, ECF No. 96 at 167).  Plaintiff avers that he did not suffer any adverse effects as a result of the additional morphine prescribed by Dr. Wieland; to the contrary, plaintiff reported that his pain level dropped "a whole lot" from "between 8 and 7" to "about a 6-1/2."  Pltf. Depo. 102:13-104:6.

• On September 25, 2012, D. Pitkin, a CMF licensed clinical social worker, saw plaintiff and noted his reports that, since his assault, he had become hypervigilant, anxious and depressed, and was sleeping poorly and having nightmares.  Smith Decl., Ex. 13 (Pitkin's Sept. 25, 2012 treatment note, ECF No. 96 at 161).  Dr. Pitkin's treatment note states that plaintiff "is usually a calm and pleasant man, who today appears tortured by what has happened."  Id.

• On September 26, 2012, Dr. Morgenstern, a CMF psychiatrist, saw plaintiff and noted his complaints of insomnia and nightmares since his assault.  Dr. Morgenstern diagnosed plaintiff with depression and an "Acute Stress Reaction;" he increased plaintiff's prescription for Remeron (an antidepressant), and offered him a prescription for Cymbalta (for depression, anxiety and neuropathic pain).  Smith Decl., Ex. 14 (Morgenstern's Sept. 26, 2012 treatment note, ECF No. 96 at 164).

• Meanwhile, plaintiff's Inmate Appeal Log No. CMF HC 12037206, submitted September 20, 2012, was designated "received" by the CMF Appeals Office on September 25,

---

[4]  Dr. Wieland's September 24, 2012 treatment note provides in full, Smith Decl., Ex. 12 (ECF No. 96 at 158):

> Inmate asks to see me.  He's having his burn wounds dressed. Relates having had increased pain due to his burns.  Was seen for f/u in ACC by Dr. Mehta in my absence on 9/17/12. Since inmate has been on same opiates with added pain of 3rd degree burns, will temporarily increase his evening MSContin [controlled-release morphine] and add some Vistari[l].  Is due to f/u shortly in ACC.

14

2012, and assigned to Dr. Wieland on September 29, 2012. Dr. Wieland interviewed plaintiff on October 16, 2012, and granted his appeal on First Level Review. See ECF No. 1 at 22-4. In his "PCP, note for Appeal," Dr. Wieland stated:

> Inmate had submitted appeal c/o being burned by another inmate. He was requesting proper medical care and pain medication. Reviewed medical care he received at UC Davis. I did see him, several days later, and increased his morphine. Inmate expresses considerable anxiety and anger about his trauma and perceptions of care. Is talking with his psychiatrist. Return as scheduled.

Smith Decl., Ex. 16 (Wieland's Oct. 16, 2012 treatment note, ECF No. 96 at 170).

- Later the same day, on October 16, 2012, CMF Chief Physician and Surgeon F. Rading, M.D., issued a formal First Level Decision granting plaintiff's Inmate Appeal Log No. CMF HC 12037206. Dr. Rading stated in pertinent part:

> You were sent initially to Stockton, but then were sent to the UC Davis burn center since Stockton hospital is not a burn center. You were seen by their team and did have follow up dressing changes. Your skin wounds, while still sensitive, are healing.
>
> Your pain medications were not changed until several days later when Dr. Wieland saw you and temporarily increased your morphine.
>
> At the First Level of Review this appeal is GRANTED. You did get medical care, and Dr. Wieland eventually did increase your pain medication. Dr. Wieland explained that there is no intent or reason for retaliation.

ECF No. 1 at 22-3.

## VI. Analysis

The parties do not dispute that during the relevant period plaintiff's burn injuries and resulting pain were serious medical needs within the meaning of the Eighth Amendment, thus meeting the first of the court's two-prong deliberate indifference analysis. See Jett, 439 F.3d at 1096. However, the parties dispute whether the conduct of either defendant meets the second prong of the analysis, that is, whether either defendant engaged in "a purposeful act or failure to respond" to plaintiff's serious pain needs, causing harm to plaintiff. Id. For plaintiff to prevail on the merits, the evidence must show that defendant acted with a "sufficiently culpable state of mind." Wilson, 501 U.S. at 297. In the present case, defendants are therefore entitled to

15

summary judgment unless the evidence demonstrates a material factual dispute that either

defendant "knew of" but "disregarded" plaintiff's need for additional medication to avoid "the

unnecessary and wanton infliction of pain." Jett, 439 F.3d at 1096; Farmer, 511 U.S. at 837.

The court assesses the evidence related to the specific occasions on which each defendant

treated plaintiff, as documented in the record. Despite plaintiff's general allegations that he had

numerous undocumented interactions with defendants between September 7 and September 24,

2012 – when they allegedly refused his requests for additional pain medication, told him he

needed to wait for his PCP to return, and told plaintiff to "man up" or "suck it up" – there is no

evidentiary basis for holding defendants accountable for plaintiff's treatment throughout this

period of time. As even Dr. Gilbert notes, "Although not reflected in Mr. Williams' medical

records, Mr. Williams stated that he saw Drs. Mathis and Daszko between September 13 and 24,

2012, and requested additional pain medications, which they denied him."[5] Gilbert Report at 205

(ECF No. 97 at 11); see also Pltf. Rsps. to Mathis' SUF #15 (ECF No. 98-4 at 5). Plaintiff's

deposition testimony on these matters was vague,[6] and his allegations remain vague despite his

declaration, pertinent Health Care Appeal, and verified complaint.[7] The lack of specific evidence

---

[5] Similarly, there is no record evidence to support Dr. Gilbert's assertion that Dr. Daszko "failed
to intervene" and provide additional pain medication to plaintiff during his bandage changes
between September 13 and September 24, 2012. As framed by Dr. Gilbert, Gilbert Report at 210
(ECF No. 97 at 16):

> [A]cute opiate pain medication is needed during the cleaning and
> debriding or cutting away of burned tissue from the face. Mr.
> Williams had 2 to 4 dressing changes daily in the B-1 Clinic during
> the time period of September 13 through September 24 during
> which he would ask for additional pain meds before undergoing this
> painful process. Although, not preparing a report for these dressing
> changes, Dr. Daszko was present during some and could have
> intervened when Mr. Williams asked for pain medications and
> failed to do so.

[6] Plaintiff testified generally that both defendants refused his further requests for additional pain
medication, and instead told him to "Suck it up," or "Be a man and wait for your PCP to get
back." Pltf. Depo. at 59:8-60:11, 100:12-102:5. However, plaintiff was unable to provide specific
dates, id. at 109:25-110:13, and conceded that he may have had these conversations with others in
the clinic who are not defendants in this action, id. at 101:24.

[7] In his declaration, after noting his September 7, 2012 injuries and treatments, and his return to
CMF, plaintiff states only generally: "On the dates in question I was seen by both defendants
Daszko and D. Mathis in the B1 clinic for complaints of pain from my burns. [¶] Defendants D.
Mathis, MD., and Daszko, both denied medication for my pain. [¶] Both defendants individually

to support plaintiff's allegations that he had numerous undocumented interactions with defendants in which he requested additional pain medication demonstrates his inability to prove these allegations at trial. In the absence of a genuine issue of material fact on this matter, the court's analysis is necessarily limited to the documented interactions between plaintiff and defendants.[8]

**A. Defendant Dr. Daszko**

**1. September 7, 2012 (Emergency Care)**

Dr. Daszko was the first physician to treat plaintiff following his injuries, beginning at 1:30 a.m., on September 7, 2012. Dr. Daszko started a saline IV, gave plaintiff two IV doses of IR morphine (5 mg at 2:22 a.m., and 5 mg at 3:57 a.m.), and oversaw application of a salve to plaintiff's burns. At 4:30 a.m., Dr. Daszko transferred plaintiff to SJGH for further assessment. At SJGH, plaintiff received 2.5 mg morphine at 7:25 a.m. Before ending his shift, Dr. Daszko confirmed with SJGH that plaintiff had no injuries to his airway and that his condition was stable, and made arrangements for plaintiff to be seen at the Burn Center that same afternoon. During the shift change, Dr. Daszko informed Dr. Mehta of plaintiff's condition, treatment, and appointment. Plaintiff does not contend that Dr. Daszko's treatment of plaintiff on September 7, 2012 was deliberately indifferent. See ECF No. 98 at 19 n.3.

////

informed me that only my primary care physician could prescribe or increase my pain medication. [¶] I submitted this appeal CMF HC 12037206 log number, to alert prison officials of a problem I was experiencing with being given pain medication from Doctors entrusted with the care of inmates." Pltf. Decl. ¶¶ 10-13 (ECF No. 27-1 at 2).

Plaintiff's subject Health Care Appeal, submitted on September 20, 2012, does not attribute his inability to obtain additional pain medication to any specific provider. Plaintiff alleged only generally that he had "repeatedly asked for pain meds to address the severe pain that I am suffering," but was "repeatedly . . . told that I need to see my own PCP for any pain medication." Cmplt., Ex. A (ECF No. 1 at 24, 26).

Similarly, with the exception of specific allegations against Dr. Daszko on September 21, 2012, Cmplt. ¶ 33 (ECF No. 1 at 10), addressed below, the allegations of plaintiff's verified complaint assert only generally that "defendants . . . told [him] that he would have to wait for his own Primary Care Physician to return from vacation because no one other than his own PCP could change his pain medications pursuant to some in-house policy. Therefore he would just have to suck-it-up and deal the best that he could with the pain." Id. ¶ 23 (ECF No. 1 at 7). Elsewhere plaintiff alleges that his requests for additional pain medications were denied by the B-1 Clinic on-duty nurse. Id., ¶¶ 31-2 (ECF No. 1 at 9-10).

[8] See also fns. 9 & 12, infra.

## 2. September 21, 2012 (Ice Packs)

The next documented interaction between plaintiff and defendant Dr. Daszko was two weeks later, on September 21, 2012,[9] when plaintiff was in the B-1 medical clinic having his bandages changed.  This was a scheduled bandage change, not a scheduled appointment with Dr. Daszko.  Plaintiff testified that Dr. Daszko was sitting at a desk 10 to 15 feet away.  Pltf. Depo. at 99:18-21.  Plaintiff states that he asked Dr. Daszko for additional pain medication, but the physician prescribed only ice packs and responded: "'You have to wait for your [PCP] doctor to come back from vacation.'  'Man up' or 'Suck it up.'"  Id. at 100:6-8.  Plaintiff contends that Dr. Daszko's failure to assess and adequately treat his pain, and refusal to prescribe additional pain medication on this occasion, was deliberately indifferent to his serious medical needs.  See Smith Decl., Ex. A (citing Pltf. Depo. at 99:7-100:11).

Dr. Daszko recalls plaintiff asking for additional pain medication on September 21, 2012, when the physician was "passing through B-1 clinic after completing my shift as MOD on my way to CSP Solano."  Daszko Depo. at 92:18-9.  Dr. Daszko testified that plaintiff "did not appear to be in any significant distress at the time," based on his "casual conversational tone" and "neutral" facial expression while conversing with Dr. Daszko and the other medical and custodial staff.  Dehoff Decl., Ex. C (Daszko Depo. at 93:23-5,  94:1-10).  Dr. Daszko testified that he responded to plaintiff as follows:

> I told him any adjustment in his pain medication would have to be done by his primary care doctor, whoever was covering for his primary care doctor, that I myself could not adjust his medication, that I was not on duty there at the time.  He asked me if there was anything I could do for him and I said, well, I could order – order you to get some ice packs to put on those areas.

Id. at 93:4-11.

Dr. Daszko testified that, based on his experience and community standards of care, "it was not in anyone's best judgment to adjust a patient's pain medications on anything but an acute basis."  Id. at 93:14-9.  He knew Dr. Wieland would be back "within several days" and

---

[9] Dr. Daszko testified that these "were the only two instances that I ever saw him."  Daszko Depo. at 93:22-3.

meanwhile "that there was a physician covering for him in the clinic." Id. at 94:22-4. Dr. Daszko testified that he prescribed ice packs because he "wanted to do something" for plaintiff that "might help his pain, even a little bit," and was "trying to be a nice guy" although he "wasn't even on duty there at the time." Id. at 94:13-8; see also Dehoff Decl., Ex. H (Sept. 21, 2012 treatment note by Dr. Daszko).

It is the opinion of plaintiff's medical expert, Dr. Gilbert, that Dr. Daszko falsely stated on September 21, 2012 that he was unable to prescribe plaintiff additional narcotic pain medication, and that providing plaintiff with ice packs was both inadequate to treat plaintiff's pain and "substandard medical care" because "the use of ice packs to treat burns could actually worsen Mr. Williams' condition and cause additional burns via frostbite." Gilbert Report at 210-11 (ECF No. 97 at 16-7).

The court assesses these allegations in the light most favorable to plaintiff. First, because plaintiff does not claim that the ice packs prescribed by Dr. Daszko caused exacerbation of his burn injuries or pain, or any new injury, this medical decision does not support a deliberate indifference claim. In the absence of demonstrated harm, plaintiff has no claim for deliberate medical indifference. Shapley v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985) (citing Estelle, 429 U.S. at 106)). "[A] mere 'difference of medical opinion . . . [is] insufficient, as a matter of law, to establish deliberate indifference.'" Toguchi v. Chung, 391 F.3d 1051, 1058 (9th Cir. 2004) (quoting Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996)).

Next, Dr. Daszko concedes that he informed plaintiff that any changes to his regularly prescribed medications would need to be made by his PCP or acting PCP. However, even assuming Dr. Daszko had discretion to prescribe additional narcotic pain medication to plaintiff on September 21, 2012, plaintiff has not presented evidence demonstrating that Dr. Daszko's failure to do so was deliberately indifferent. Specifically, plaintiff has presented no evidence to refute Dr. Daszko's assessment that plaintiff's pain level appeared tolerable that day because plaintiff "did not appear to be in any significant distress" based on his "casual conversational tone" and "neutral" facial expression. Daszko Depo. at 93:23-5, 94:1-10. In his own deposition testimony, plaintiff conceded that he used a normal conversational tone in making his request to

Dr. Daszko, Pltf. Depo. at 100:2-11, and chose not to press the interaction, which lasted only "seconds," id. at 101:12-5. Moreover, September 21, 2012 was two weeks after plaintiff sustained his injuries and more than a week after plaintiff's return from the Burn Center, during which time he had been receiving his regularly prescribed narcotic pain medications. For these reasons, no reasonable trier of fact could conclude that Dr. Daszko was subjectively aware of acute pain that required his intervention, and to which he was deliberately indifferent.

Dr. Wieland, plaintiff's PCP, returned three days later, on September 24, 2012, and increased plaintiff's pain medications for a period of one week, until October 1, 2012. However, Dr. Weiland testified that his primary intent in doing so was not necessarily pain relief, but to demonstrate support for plaintiff.[10] Additionally, on September 17, 2012, four days before his interaction with Dr. Daszko, plaintiff was examined by Dr. Mehta (Dr. Wieland's temporary replacement), who refused plaintiff's request for additional pain medication. Mehta Depo. at 196:22-198:6. Dr. Mehta is not a defendant in this action. Finally, although Dr. Daszko was "not on duty" when plaintiff spoke with him on September 21, 2012, Dr. Daszko prescribed ice packs

---

[10] Dr. Wieland testified in pertinent part:

> Q: How did you decide to increase the dose for this specific amount of time?
> A: I have no recollection for why I did what I did. But looking at this, this was 20 days after his – and burns typically are much improved by this time. So whether it was just because of his complaints of pain and/or with that knowing how – how focused people often are on pain, I had wanted to do something, even if a small amount, to help him mentally say, okay, I'm getting something so that he could get on with dealing with other things rather than focusing so much on pain.
> Q: Why did you believe that it was important to give Mr. Williams a small measure of relief from his pain?
> A: As I've just stated, that's – that's a guess on my part. Because looking at what I did, why would I have done that?
> Q: Um-hum.
> A: One often, whether in the field of medicine or field of law, does things because you need to get on with the business. And he has a lot of medical problems and I wanted to concentrate on them. I'm not denying your pain, patient. Here's a bit of pain medicine. Let's get on with business at hand.

Wieland Depo. at 62:24-63:21.

in an effort "to be a nice guy" and "do something" that "might help [plaintiff's] pain, even a little bit." Daszko Depo. at 94:13. This gesture suggests consideration, rather than deliberate indifference.

Viewing plaintiff's interaction with Dr. Daszko on September 21, 2012 in context of all these circumstances, the undersigned finds that no reasonable trier of fact could conclude that Dr. Daszko "purposefully ignored" or "failed to respond" to a serious medical need for additional pain relief. McGuckin, 974 F.2d at 1060. Even if Dr. Daszko told plaintiff to "man up" or "suck it up," plaintiff has presented no evidence that Dr. Daszko's medical decision was "unacceptable under the circumstances" or chosen "in conscious disregard of an excessive risk to plaintiff's health." Jackson, 90 F.3d at 332 (citations omitted). A callous remark, without more, will not support relief. "A defendant must purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order for deliberate indifference to be established." McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir. 1992), overruled on other grounds, WMX Techs., Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997).

For these reasons, the undersigned recommends that defendant Dr. Daszko's motion for summary judgment be granted.[11]

**B.    Defendant Dr. Mathis (September 7, 2012 Return from Burn Center)**

When plaintiff returned to CMF from the Burn Center at 8:45 p.m. on September 7, 2012, he was treated by receiving physician defendant Dr. Mathis.[12] Following the orders of Burn Center Fellow Dr. Palafox, Dr. Mathis debrided the burns on plaintiff's face and dressed the wounds with bacitracin/zinc ointment. Dr. Mathis instructed plaintiff to leave the arm bandages in place for six days, then have them removed at the clinic, and continue applying the ointment to

---

[11]  The court does not reach defendant Daszko's qualified immunity defense. When a court decides that plaintiff's allegations do not support a constitutional violation, "there is no necessity for further inquiries concerning qualified immunity." Saucier v. Katz, 533 U.S. 194, 201 (2001).

[12]  Dr. Mathis avers that "[t]he visit on September 7, 2012, as reflected in Exhibit 'G,' is the only time I saw Mr. Williams in relation to the injury that is the subject of this action . . . . Between September 7, 2012, and September 24, 2012, the only time I treated Mr. Williams was upon his return from UC Davis Medical Center on the evening of September 7, 2012, as reflected in my note attached as Exhibit 'G.'" Mathis Decl., ¶ 15 (ECF No. 89 at 6); cf. Mathis Depo. at 135:23-136:24 (stating that he saw plaintiff one additional time unrelated to this injury and "in the hallway numerous times").

21

his face.  It is undisputed that Dr. Mathis did not administer or prescribe further pain medication on the evening of September 7, 2012, but that plaintiff received his regularly prescribed pain medications later that evening after his appointment with Dr. Mathis.  See Mathis Decl. ¶ 13 (ECF No. 92-4 at 5) ("[S]hortly after my visit with [plaintiff] in the TTA on September 7, 2012, he was given his normal evening doses of pain medication upon returning to his housing unit.").  It is also undisputed that plaintiff continued to receive his regularly prescribed pain medications the next morning, September 8, 2012, three times per day, until plaintiff was returned to the Burn Center on September 10, 2012 for a period of three days, where he was intravenously administered both morphine and fentanyl.

Plaintiff contends that the condition of his burns and vital signs upon his return from the Burn Center on the evening of September 7, 2012, should have made it obvious to Dr. Mathis that plaintiff required additional pain medication.  Plaintiff relies on Dr. Mathis' treatment note indicating that plaintiff had an elevated pulse of 110 beats per minute and elevated blood pressure of 140 over 79, and that Dr. Mathis "debrided [plaintiff's] 2 degree burns over the inferior forehead, across the nose, cheeks and some on the upper lip" without offering additional pain medication.  See Mathis Decl., Ex. G (Mathis Sept. 7, 2012 treatment note) (ECF No. 89 at 35).  Plaintiff avers that he asked for pain medication upon his return from the Burn Center, but was informed that "the only person that can give dose pain medications is your own PCP [Dr. Wieland] . . . [who] was gone on vacation for two or three weeks."  See Smith Decl., Ex. 1 (Pltf. Depo. at 48:6-8, 17-20, 23-5, 49:1-4)

It is the opinion of plaintiff's expert, Dr. Gilbert, that "Dr. Mathis failed to provide the medically accepted standard of care to Mr. Williams, by declining to prescribe additional pain medication, specifically opiates, when Mr. Williams returned from UCDBC in at least four ways."  Gilbert Report at 209-10 (ECF No. 97 at 15-6).  Specifically, Dr. Gilbert opines:

> First, Dr. Mathis, who stated during his deposition that he is very liberal with his narcotic medication use, should have known that that there was little danger of increasing Mr. Williams' narcotic regimen during this acute injury phase, as was the case on the evening of September 7, 2012, and that additional narcotic pain medications were needed to alleviate Mr. Williams' pain.  As noted above, this would be particularly true of Mr. Williams, given his

underlying chronic pain condition and treatment.

Second, acute opiate pain medication is needed during the cleaning and debriding or cutting away of burned tissue from the face. Mr. Williams had not received his afternoon or evening doses of his chronic pain medications while this was being performed by Dr. Mathis on September 7, 2012. Mr. Williams' talkativeness during this encounter was likely from anxiety, which should have been apparent to Dr. Mathis, as Mr. Williams' vital signs demonstrate tachycardia and hypertension, consistent with Mr. Williams' complaints that he was in pain. Further, Dr. Palafox had described Mr. Williams as distressed approximately one hour and thirty minutes prior, and Mr. Williams had not received any intervening pain treatment.

Third, as the receiving physician for Mr. Williams upon his return from UCDBC, had Dr. Mathis prescribed pain medication for the acute pain Mr. Williams was experiencing, Mr. Williams could have avoided the pain and suffering he experienced over the following three days, before being returned to UCDBC.

Fourth, because Dr. Mathis failed to act at this time, Mr. Williams was forced to suffer for the next 3 days without proper pain treatment and regimen for his burns and acute pain. At a minimum, an as-needed order at this time for additional immediate release morphine before dressing changes would have ensured that Mr. Williams was treated in a manner consistent with the standard of care and also the pain guidelines set forth by the CPHCS.

Id.

Defendant Mathis responds that, on the subject evening, he made an informed medical decision that plaintiff did not require additional pain medication. See Mathis Depo. at 132:21-135:1. Dr. Mathis avers:

During this visit, Mr. Williams was very talkative and did not appear to me to be in any distress. Accordingly, while I could have given him whatever available pain medication that I thought was medically necessary and appropriate, it was not, in my opinion, medically necessary or appropriate for Mr. Williams to be given any additional morphine (or any other pain medication) at that time. And as for the future . . . I reviewed his medical records and confirmed that he was already being prescribed medication for pain (a total of 45 milligrams of morphine, as well as 650 milligrams of acetaminophen, three times per day). Based on my observation and examination of, and interaction with, Mr. Williams during this visit, as well as my education, experience, and training, it was my opinion that the amount and type of pain medication that was being prescribed to Mr. Williams was appropriate and adequate to treat pain that he might experience related to his burn. In my opinion, therefore, it was not medically necessary to increase the amount of pain medication that was already being prescribed, or otherwise

prescribe additional pain medication, to Mr. Williams. Nor did I believe it appropriate, considering the amount of morphine – a very powerful and highly-addictive narcotic – Mr. Williams was taking. Moreover, I did not believe that Mr. Williams was at any risk of harm or unnecessary pain as a result of my decision not to provide him with additional pain medication.

My decision not to provide Mr. Williams with any additional morphine or pain medication during this visit is further supported by the fact that, shortly after my visit with him in the TTA on September 7, 2012, he was given his normal evening doses of pain medication upon returning to his housing unit. Specifically, Mr. Williams was given one 30 milligram extended release morphine tablet, one 15 milligram immediate release morphine tablet, and 650 milligrams of acetaminophen. Meaning, throughout the day on September 7, 2012, Mr. Williams was given no less than 112.5 [sic] morphine milligram equivalents, a very significant amount (. . . the Centers for Disease Control currently recommends avoiding, if possible, a daily dose greater than 90 morphine milligram equivalents).

Mathis Decl. ¶¶ 12-3 (citing Ex. G, Mathis' Sept. 7, 2012 treatment note, ECF No. 89 at 35); <u>see also</u> Mathis Decl., Ex. H (Pltf. Medication Administration Records, ECF No. 89 at 36-9).

The assessments of Dr. Mathis and Dr. Gilbert demonstrate a material factual dispute concerning what pain medications had been administered to plaintiff prior to his treatment by Dr. Mathis on the evening of September 7, 2018. Dr. Mathis opines that plaintiff had been given his regular doses of pain medication "throughout the day on September 7, 2012," Mathis Decl.,¶ 13; <u>see also</u> Mathis Depo. at 132:1-3 ("[H]e had been on pain medication all day, taking a lot of morphine. He was on long-acting morphine.") However, Dr. Gilbert opines that plaintiff "had not received his afternoon or evening doses of his chronic pain medications while this [debriding] was being performed by Dr. Mathis on September 7, 2012." Gilbert Report at 210.

Review of the record evidence appears to support Dr. Gilbert's assessment. Shortly after plaintiff sustained his injuries, he received, at CMF's TTA, 5 mg IR morphine at 2:22 a.m., and 5 mg IR morphine at 3:57 a.m.; then, at 7:25 a.m., he received 2.5 mg IR morphine at SJGH. It appears that plaintiff received no other pain medication until 3:02 p.m., when he received 30 mg ER morphine upon his return to CMF from SJGH.[13] It also appears that plaintiff received no pain

_____

[13] Although the parties dispute whether this 30 mg ER morphine tablet was "in addition to" or "in lieu of" plaintiff's regularly prescribed morphine, it is reasonable to infer from the record that this was the first 30 mg ER morphine plaintiff received on September 7, 2012, provided by Dr. Mehta in the TTA as part of plaintiff's emergency care; this dose is not reflected in plaintiff's

medication when he was treated at the Burn Center.[14]  Thus, when plaintiff returned from the

Burn Center to CMF at 8:45 p.m., it appears that he had received a total of 12.5 mg IR morphine

and 30 mg ER morphine.  Had plaintiff received his first and second doses of his regular pain

medications, he would then have received 30 mg IR morphine, 60 mg ER morphine, and 1300 mg

acetaminophen, significantly more pain medication than it appears plaintiff received.

Dr. Mathis' apparent error in determining how much pain medication plaintiff had

received on September 7, 2012, may reflect no more than negligence.  However, a reasonable

juror could conclude, alternatively, that such assessment was deliberately indifferent based on all

the circumstances.  Dr. Mathis' apparent error underscores the more fundamental material factual

dispute concerning Dr. Mathis' subjective assessment of plaintiff's pain level.  Dr. Mathis

testified that plaintiff's burns "were no longer as acute as they were first thing in the morning."

Mathis Depo. at 134:3-5.  Nevertheless, it was the same day that plaintiff had sustained his

injuries, which were sufficiently serious to warrant specialized care at SJGH and the Burn Center

prior to Dr. Mathis receiving plaintiff back to CMF.  Although Dr. Mathis and Dr. Gilbert dispute

the inferences to be drawn about plaintiff's pain level based on his demeanor when he was treated

by Dr. Mathis, plaintiff's objective injuries remained obvious.[15]  Moreover, Dr. Mathis concedes

that he did not ask plaintiff about his pain level.  Mathis Depo. at 133:6-8 ("Do you have any

recollection of asking Mr. Williams, 'Are you in pain?'"  "I don't have any recollection of it,

---

routine Medication Administration Record.  Cf., Mathis' SUF # 4 (citing Mathis Decl. ¶ 9, Ex. E (Medication Reconciliation Form, ECF No. 89 at 31), with Plaintiff's SAF # 9 (citing Smith Decl. ¶7, Ex. 6 (same Medication Reconciliation Form, ECF No. 96 at 136-9), and Gilbert Decl. (Gilbert Report at 204, 210, ECF No. 97 at 10, 16); and plaintiff's routine Medication Administration Records (ECF No. 89 at 36-9).

[14]  Although the parties dispute whether Dr. Palafox administered or prescribed additional pain medication to plaintiff (see Mathis' SUF # 5 (citing Mathis Decl. ¶ 10, Ex. F )), it is reasonable to infer from Dr. Palafox' omission of any reference to medications that he neither administered nor prescribed additional pain medication to plaintiff when he was at the Burn Center.  Plaintiff avers that he "was not provided with pain medications" while at the Burn Center because he was treated as an outpatient.  Pltf. Decl. ¶ 8 (ECF No. 27-1 at 2).

[15]  Plaintiff avers that he requested additional pain medication but his request was denied.  At his deposition, plaintiff did not recall with whom he spoke, and did not identify Dr. Mathis specifically.  See Pltf. Depo. at 49:1-51:2.  The court's analysis is not dependent on whether plaintiff directly asked Dr. Mathis for pain medication.

no.").  Nor did Dr. Mathis ask plaintiff to rate his pain, <u>id.</u> at 116:23-117:6, despite the recommendation to use numeric and other pain scales set forth in CDCR's Pain Management Guidelines, <u>see</u> Guidelines, Smith Decl., Ex. 19 (ECF No. 98-1 at 62-3).

Even had plaintiff received his regularly prescribed pain medications throughout the day on September 7, 2012 (and therefore that Dr. Mathis' assessment was correct), Dr. Gilbert opines that "patients who are on chronic narcotic therapy for their pain syndromes become tolerant of the narcotics they are taking and have lower pain thresholds than most people.  Mr. Williams' chronic pain made his need for stronger, narcotic pain medications even more necessary."  Gilbert Report at 206 (ECF No. 97 at 12).  Dr. Gilbert relies on the "acute pain algorithm" set forth in CDCR's Pain Management Guidelines to opine that plaintiff should have been provided "additional narcotics for acute pain beyond [his] existing chronic pain medication doses."  <u>Id.</u> at 208 (ECF No. 97 at 13-5).  This algorithm supports plaintiff's contention that Dr. Mathis should have prescribed additional pain medication not only on the evening of September 7, 2012, but for at least the next three days, if only on an as-needed basis, before plaintiff was transferred back to the Burn Center from September 10, 2012 to September 13, 2012.

Dr. Mathis' apparent mistake concerning the quantity of pain medications administered to plaintiff prior to treating him on the evening of September 7, 2012, defeats the argument that his decision to refrain from administering or prescribing additional pain medication was no more than a nonactionable difference of medical opinion.  This principle applies "where a defendant has based his actions on a medical judgment that either of two alternative courses of treatment would be medically acceptable under the circumstances."  <u>Jackson</u>, 90 F.3d at 332.  However, this principle should apply only if the underlying circumstances are perceived accurately or, under limited circumstances not clearly apparent here, reasonably perceived inaccurately.

Whether Dr. Mathis knew of but disregarded plaintiff's alleged need for additional pain medication on September 7, 2012 presents material factual questions that cannot be resolved on summary judgment.  Plaintiff has adduced sufficient evidence to require a trial on his medical deliberate indifference claim against defendant Mathis.  For this reason, the undersigned

////

recommends that defendant Mathis' motion for summary judgment be denied.[16]

**VII.   Conclusion**

Accordingly, for the foregoing reasons, IT IS HEREBY ORDERED that:

1. Plaintiff's request that his response to defendant Mathis' evidentiary objections, ECF No. 102, be construed as an authorized surreply is GRANTED.

2. Defendant Mathis' objections to plaintiff's evidence, ECF No. 101-3, are OVERRULED for the reasons set forth above.

Additionally, IT IS HEREBY RECOMMENDED that:

1. Defendant Daszko's motion for summary judgment, ECF No. 90, be GRANTED; and

2. Defendant Mathis' motion for summary judgment, ECF No. 92, be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one (21) days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within seven (7) days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: June 5, 2018

_____
ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE

---

[16]  Defendant Mathis does not assert a qualified immunity defense.  Nevertheless, even if he had, "a genuine issue of material fact prevents a determination of qualified immunity until after trial on the merits." Liston v. County of Riverside, 120 F.3d 965, 975 (9th Cir. 1997), as amended (Oct. 9, 1997) (citing Act Up!/Portland v. Bagley, 988 F.2d 868, 873 (9th Cir. 1993)).